AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America<br>v.<br>Yelena Kabanskaya,<br><br>*Defendant(s)* | Case No. 3 19 71452 JCS |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **February 1, 2018** in the county of **San Francisco** in the **Northern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

~~UNDER SEAL~~

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: /s/
WILLIAM FRENTZEN
Assistant United States Attorney

*Complainant's signature*
Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/3/19

*Judge's signature*

City and state: San Francisco, California     Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

1-mjr

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Dr. Yelena KABANSKAYA ("KABANSKAYA").

2. There is probable cause to believe KABANSKAYA engaged in a scheme to defraud Medicare by receiving kickback payments in exchange for the referral of home healthcare and/or hospice patients in violation of 42 U.S.C. §1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4. An identified co-conspirator introduced KABANSKAYA to CW-1 and UCE as an individual who was willing to accept kickback payments in exchange for the referral of patients.

5. During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with KABANSKAYA in 2017 and 2018, in which KABANSKAYA received kickback payments, in the form of cash and check, in exchange for the referral of patients for home health or hospice services.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 is employed by a home health care agency ("HHA"), which serves as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1's HHA may increase. These potential increases to CW-1's HHA may provide an intangible benefit to CW-1 by improving his/her standing with the employing HHA. To my knowledge, CW-1's information has not been found to be false or misleading. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is not known to be a defendant for any pending charges. CW-1 has proven to be a consistently reliable source of information because much of his/her information has been independently corroborated by various means, including through recorded conversations, other CW-1 reporting, and the undercover operation.

1

## B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon

3

analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

4

no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. Dr. Yelena KABANSKAYA, is a 39-year-old licensed physician who resides in San Jose, CA and is employed as a medical director at Good Samaritan hospital located in San Jose,

5

California. During the course of the investigation, KABANSKAYA accepted at least $6,000 in kickbacks from an FBI UCE in exchange for patient referrals.

### E. STATUTE VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. A COOPERATING WITNESS ARRANGES THE KICKBACK SCHEME WITH KABANSKAYA

16. In January 2017, CW-1 identified Glennda SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

17. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

18. During the course of the UCO, SANTOS introduced multiple individuals willing to accept kickback payments in exchange for home health or hospice patient referrals. KABANSKAYA was introduced to CW-1 and UCE by another doctor (hereinafter referred to as "CW-2"), who was introduced into the scheme by SANTOS.

19. On December 24, 2017, KABANSKAYA sent CW-1 a text message introducing herself as one of CW-2's contacts. Set for below is an excerpt of their text exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| KABANSKAYA: | Hello. My name is Liliana covenants Kia, I'm a physician and good Samaritan hospital. [CW-2] give me your number. Do you take patients with Medicare | |

|  | Aand B? |  |
|---|---|---|
| KABANSKAYA: | Sorry, Yelena Kabanskaya |  |

20. On January 8, 2018, CW-1 sent a group text to UCE and CW-2. In the exchange, CW-1 advised of his/her attempts to schedule a meeting with KABANSKAYA. Set forth below is an excerpt of the aforementioned texts:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | I texted Dr Kabanskaya to meet as well so let's see what she says |  |
| CW-2: | Ok, be very careful with her. You will be meeting the whole team next month. | CW-2 asks the CW-1 and to limit their discussion of CW-2's involvement in the kickback scheme (i.e. "be very careful"). |

21. On January 9, 2018, UCE and CW-1 recorded a meeting with KABANSKAYA near a Starbucks coffee shop in Los Gatos, CA. The purpose of the meeting was to introduce themselves to KABANSKAYA and discuss the kickback scheme. Below are excerpts of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | You know, a little bit more aggressive business practices where the doctors see some returns for their work, so we can partner with them and they benefit and in a way we're all in this together. Does that make sense? | UCE uses the phrase "aggressive business practices" to obliquely refer to the kickback scheme and how it can financially benefit them both. |
| KABANSKAYA: | Mhmm. |  |
| ... | ... |  |
| UCE: | Let me tell you a little bit how we go about it ultimately. You're right, we have to be very careful. So we always tell everyone, that this is their decision, well explain to you why we think we're being careful, but absolutely you're right, if at any point you feel that is isn't the way you wanted to do it, we, even if you start, change your mind, whatever it is, we will shake your hand and say thank you. We don't want anyone in a position where they're uncomfortable or doing things they're not comfortable with. So at any point you think you know what, this isn't for me, well shake your hand and say thanks. Even if you started. | UCE describes how KABANSKAYA needs to think carefully prior to participating in the kickback scheme and her participation is voluntary. Further, UCE implies such consideration is important because the scheme is illegal. |
| ... | ... |  |

7

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | [UI] A couple things we do, we ask for people to build their relationships slowly, ya know, in the beginning its like we're trying out the new company, so we ask in the beginning, you only do a couple, maybe the next month do a couple of more. | UCE explains to KABANSKAYA that she would only provide a few patient referrals in the beginning and increase over time to prevent authorities from detecting their kickback scheme. |
| KABANSKAYA: | So a couple, couple more. | KABANSKAYA responds that she understands the plan of increasing referrals over time. |

### B. KABANSKAYA ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

22. On or about January 24, 2018, CW-1 sent KABANSKAYA a text asking if KABANSKAYA was comfortable with the proposed kickback scheme and its terms. Set forth below is an excerpt of their aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | if you are ok with what we discussed and would love to meet again when you are available | |
| KABANSKAYA: | yes | KABANSKAYA agrees to participate in the kickback scheme. |

23. During their second meeting on February, 1, 2018, KABANSKAYA discussed with CW-1 and UCE the number of patients that were expected in exchange for the kickback payments. UCE offered to increase KABANSKAYA's kickback payment each month as the number of patients KABANSKAYA referred increased, maxing out at $5,000 in exchange for eight to ten patients per month. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So, um, what we have typically done, is we've started to ask for only a couple in the beginning, is that we've paid three thousand for the first month | UCE is referring to receiving a couple of patients for the first payment of $3,000. |
| KABANSKAYA: | Mmhmm. | |
| UCE: | Four thousand for the next, and, um, uh, five thousand a month for, for at the 8 to 10 level. | UCE explains the next month KABANSKAYA would receive a high kickback payment of $4,000 in exchange for 8-10 patients. |
| KABANSKAYA: | Mmhmm. | |

8

| Speaker | Statement | |
|---|---|---|
| UCE: | Is that, that in keeping with your expectations? | |
| KABANSKAYA: | Mmhmm. | |
| UCE: | Okay. | |
| KABANSKAYA: | Yeah. | |

24. Prior to the meeting, KABANSKAYA referred five patients to HHA Alpha. UCE offered KABANSKAYA $2,500 for the referral of the patients ($500 per patient) and another $1,500 as a "signing bonus" for agreeing to the arrangement. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Okay, um, given what you've already done and sort of the signing bonus, we'd already discussed and agreed that we'd pay you four thousand for… | "What you've already done" refers to KABANSKAYA referring five patients to HHA Alpha. |
| KABANSKAYA: | Okay. | |
| UCE: | …for signing on for us today. Um.. | Agreeing to participate in the scheme. |
| KABANSKAYA: | Signing? Okay. | |
| UCE: | Basically agreeing to work for us. | |
| KABANSKAYA: | Okay. | |
| UCE: | So even though you didn't give us, you gave us five, which would be twenty-five hundred, we're just giving you an extra fifteen hundred as, sort of, good will… | |
| KABANSKAYA: | Mmhmm. | |

25. During the course of the UCO, KABANSKAYA met with UCE on at least six occasions and received at least $6,000 in kickback payments from UCE. In exchange for the kickback payments, KABANKSAYA referred at least eight Medicare beneficiaries to HHA Alpha.

### C. KABANSKAYA ENTERS INTO A FRAUDULENT CONSUTLING AGREEMENT WITH UCE IN ORDER TO CONCEAL THE KICKBACK PAYMENTS

26. Later during the course of the UCO, KABANSKAYA and UCE agreed to enter into a consulting contract in order to conceal the kickback payments as legitimate services allegedly provided by KABANSKAYA.

27. During a recorded meeting on May 17, 2018, KABANSKAYA and UCE discussed the concealment contract or "cover document." Below is an excerpt of the aforementioned exchange:

9

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | But so um we created a company called [Covert Company #1][6] ... | UCE explains that he has created a fraudulent consulting company to help them conceal their kickbacks as legitimate services provided to the newly established company. |
| KABANSKAYA: | Uh huh. An investment. | |
| UCE: | Ah yes and so you know how the normal legal documents are like ten pages long with all sorts of caveats. | |
| KABANSKAYA: | No, no, no, no. | |
| UCE: | So because we're not gonna, no one's gonna sue anyone over this document. We left out all that legal stuff because I don't want people who are signing this have to say like oh I need to go get a lawyer, I mean, (UI) so we made it extremely simple. | UCE explains how their consulting contract is devoid of all legal language and caveats as it is simply a cover and neither party intends to provide or receipt the services described therein. |
| KABANSKAYA: | But is this legit? | |
| UCE: | So, you want me to talk here or? | UCE inquires whether KABANSKAYA wants to discuss the kickback scheme in greater detail or be more discrete. |
| KABANSKAYA: | Yeah. (UI). | |
| UCE: | So basically this is, remember how like when you would send us patients, we were just gonna pay you by check? | |
| KABANSKAYA: | Right, right, right, right. | |
| UCE: | So this is supposed to cover that. It's not, I mean, this is just a document to, to explain why we're writing you checks. | UCE explains the contract will be a "cover" for kickback payments made via check as part of the kickback scheme. |
| KABANSKAYA: | Right. | |
| UCE: | They were writing the checks to the patients. | |
| KABANSKAYA: | Right. | |
| UCE: | So since this is for a service that you're not providing, I'm not asking you to provide me services, you're, so, I could, it was silly to have this detailed legal document that neither one of us is gonna sue each other over. | UCE confirms that KABANSKAYA will not perform any consulting services as outlined in the agreement and, instead, the contract merely serves to conceal the illegal kickback payments (i.e. "I'm not asking you to provide me services"). |

---

[6] The true name of the company is omitted to protect the investigation.

10

| KABANSKAYA: | Right. | |
|---|---|---|
| UCE: | So we made it extremely simple and it's, and it's a valid contract but it's, it's not for any services… | |
| KABANSKAYA: | Right. | |
| UCE: | Okay. | |
| KABANSKAYA: | But it's a valid piece of paper. | KABANSKAYA seeks further explanation from UCE. |
| UCE: | It's a valid piece of paper. I mean but in the sense that you and I would sign this solely for the purpose of explaining the, to cover up the real reason to have the checks. | |
| KABANSKAYA: | Mm hmm. | |
| UCE: | So it says that you're providing consulting but you're not actually providing any consulting . So if you, if you look at it this is (UI). We're (UI) home health and hospice. You are knowledgeable in procedures, so we agree you will provide us with verbal advice on proper operation. Um we'll pay you at two fifty an hour ah you give us an invoice ah saying when and where you helped us and then we pay you in at least seven days. So it's super simple and and we did certain things like verbal (UI), you're not actually doing any consulting, so there's no reports . .. | UCE explains how KABANSKAYA can appear to be providing services given her expertise and claim services were provided verbally. UCE reiterates that no consulting services will ever be owed. |
| KABANSKAYA: | Right. | |

28. FBI interviewed KABANSKAYA on January 24, 2019. KABANSKAYA acknowledged receiving cash and checks from HHA Alpha but denied the payments were for patient referrals. KABANSKAYA also denied cashing any of the checks received from Covert Company #1. A review of Covert Company #1's checking account confirmed, at the time of the interview with Agents, KABANSKAYA had not cashed any of the checks provided by UCE.

III. **PROBABLE CAUSE FOR THE VIOLATION**

A. **TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE**

29. Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an

individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

30. Based on all of the foregoing, probable cause exists to believe that KABANSKAYA accepted kickback payments from UCE that were intended to induce KABANSKAYA to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

31. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by KABANSKAYA for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

32. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by KABANSKAYA in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

33. Based on the foregoing, there is probable cause to believe KABANSKAYA engaged in a scheme to defraud Medicare by receiving kickbacks in exchange for patient referrals, in violation of Title 42 U.S.C. § 1320a-7b(b)(1)(A).

## V. REQUEST FOR SEALING

34. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.

//
//
//
//
//
//
//

Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

this 3rd day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge